UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GREATER NEW ORLEANS FAIR                    CIVIL ACTION
HOUSING ACTION CENTER

VERSUS                                          NO. 18-8177

JERRY W. KELLY, JR., ET AL.                  SECTION "R" (2)

## ORDER AND REASONS

Before the Court is defendants' motion to dismiss the case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), or in the alternative to strike sections of the complaint. The Court finds that (1) plaintiff has sufficiently alleged it has standing to bring this action, (2) plaintiff's factual allegations are sufficient to state each of its claims, and (3) the paragraphs in the complaint to which defendants object are relevant to plaintiff's claims. Defendants' motion is therefore denied.

## I.    BACKGROUND

### A.    Plaintiff's Initial Investigation

This case arises from allegations of sex-based housing discrimination.[1] Plaintiff, the Greater New Orleans Fair Housing Action Center, alleges that

---

[1]      R. Doc. 1.

defendant Jerry W. Kelly, Jr., the owner and/or manager of multiple rental properties throughout the New Orleans area,[2] has discriminated against tenants on the basis of their sex.[3]

Plaintiff asserts that it first became aware of allegations of sex-based discrimination against Kelly in March 2017, after seeing statements from his former and current tenants in a "social media housing-related forum."[4] In the forum, some of Kelly's former female tenants allegedly detailed how Kelly exhibited "sexually harassing behavior" towards them, including by making "sexual propositions" and "unauthorized and unannounced entry into their apartments."[5] Then, in August 2017, a "former leasing agent" for Kelly's rental properties allegedly contacted plaintiff to report that Kelly had engaged in a "pattern of sex-based discrimination."[6] The agent allegedly told plaintiff that she observed Kelly turn away more qualified men in order to rent to women, and that Kelly preferred to rent to "young, skinny, white" girls.[7] The agent also allegedly told plaintiff stories similar to those recounted in the social media forum—namely, that Kelly harassed his female

---

[2]     *Id.* at 4 ¶ 12.
[3]     *Id.* at 2 ¶ 2.
[4]     *Id.* at 6 ¶ 23.
[5]     *Id.* ¶ 24.
[6]     *Id.* at 7 ¶ 26.
[7]     *Id.* ¶¶ 27-28.

tenants by making sexual propositions and unauthorized and unannounced entry into their apartments.[8]

Plaintiff states that it then conducted interviews with two of Kelly's former female tenants.[9]  The first former tenant—whom plaintiff refers to as "A.B."—allegedly said that all six of the units in her building were rented to women, and that Kelly specifically told her he rents to women only.[10]  A.B. also allegedly reported that Kelly told her he would reduce her rent if she "set him up on a date" with one of her female friends.[11]  According to plaintiff, the second former tenant, "B.C.," alleged that when she met with Kelly to sign her lease agreement, Kelly told her he returned her initial phone call only because he believed she was attractive based on the sound of her voice, and that he would not have rented to her had he known she was married.[12]  B.C. also allegedly told plaintiff that Kelly grabbed her buttocks without her consent during this meeting.[13]  Finally, B.C. allegedly told plaintiff that Kelly repeatedly entered her apartment without warning and without her consent, including once when she was in the shower.[14]

---

[8]     *Id.* ¶ 29.
[9]     *Id.* ¶ 31.
[10]    *Id.* at 8 ¶¶ 32-33.
[11]    *Id.* ¶ 36.
[12]    *Id.* at 9 ¶¶ 39-40.
[13]    *Id.* at 8 ¶ 38.
[14]    *Id.* at 9 ¶ 41.

### B.	Plaintiff's Testers

Plaintiff asserts that after compiling the information from the online forum, the former leasing agent, and the former tenants, it decided to commence a series of tests to assess whether Kelly was engaging in unlawful discrimination.[15]  In April and May 2017, and then again in October 2017, plaintiff allegedly sent different pairs of prospective renters—each pair consisting of one male and one female tester—to inquire about renting one of Kelly's units advertised as available.[16]

#### 1.	Test 1

On April 26, 2017, female tester #1 allegedly called Kelly at the phone number included on a rental listing for 4233 Fontainebleau Drive in New Orleans.[17]   According to plaintiff, the advertisement listed apartment number 7 at this address as available.[18]  Plaintiff asserts that Kelly answered the call and arranged for female tester #1 to view the unit on April 29.[19]  On April 27, one day after female tester #1 called, male tester #1 allegedly called the same phone number listed in the advertisement.[20]  Kelly allegedly did not

---

[15]	*Id.* ¶ 42.
[16]	*Id.* at 9-18.
[17]	*Id.* at 10 ¶ 46.
[18]	*Id.* ¶ 44.
[19]	*Id.* ¶ 46.
[20]	*Id.* ¶ 47.

answer this call, and the male tester left a voicemail message stating his interest in the advertised apartment and asking Kelly to call him back.[21] Plaintiff states that Kelly never returned the male tester's voicemail.[22]

On April 29, female tester #1 and her female companion allegedly viewed the rental unit unaccompanied by Kelly.[23] Plaintiff alleges that female tester #1 contacted Kelly after viewing the apartment, and Kelly invited her to meet with him to discuss the unit and review a rental application.[24] Plaintiff asserts that during this meeting, female tester #1 and her friend observed Kelly "openly staring at their bodies and nibbling his lip as he looked at [female tester #1's] legs."[25] According to plaintiff, female tester #1 and her friend reported feeling unsafe during this encounter.[26] Plaintiff states that after this meeting female tester #1 did not contact Kelly again.[27]

### 2. Test 2

On May 3, 2017, female tester #2 allegedly called Kelly to inquire about 4233 Fontainebleau Drive apartment number 7, which was still advertised as

---

[21] *Id.*
[22] *Id.* at 11 ¶ 56.
[23] *Id.* at 10 ¶ 48.
[24] *Id.* ¶ 49.
[25] *Id.* at 11 ¶ 53.
[26] *Id.* ¶ 54.
[27] *Id.* ¶ 55.

available.[28]  Plaintiff states that Kelly answered the phone and arranged to meet with the female tester to tour the unit the following day.[29]  According to plaintiff, two hours after female tester #2's call, male tester #2 called the same number.[30]  Kelly allegedly did not answer the call, and the male tester left a voicemail message asking Kelly to call him back.[31]  On May 4, 2017, female tester #2 and her female companion allegedly met Kelly at 4233 Fontainebleau Drive.[32]  Plaintiff alleges that Kelly explained that apartment number 7 had been rented, but that he could show them apartment number 3, which was available.[33]

Plaintiff asserts that on May 9, 2017, six days after his first call, male tester #2 tried again to contact Kelly.[34]  Kelly allegedly answered the phone, and arranged to meet male tester #2 the following day to view a unit at 4233 Fontainebleau Drive.[35]  Kelly allegedly instructed the male tester to call him the following morning to confirm the appointment.[36]  The next morning male tester #2 allegedly called Kelly two different times, but Kelly did not answer

---

[28]     *Id.* at 12 ¶ 58.
[29]     *Id.*
[30]     *Id.* ¶ 59.
[31]     *Id.*
[32]     *Id.* ¶ 61.
[33]     *Id.* ¶ 62.
[34]     *Id.* ¶ 63.
[35]     *Id.*
[36]     *Id.*

either call.[37]  Plaintiff asserts that male tester #2 left Kelly voicemails on both calls, but Kelly never responded to the messages.[38]  Male tester #2 was allegedly never able to tour an available unit.[39]

### 3. Test 3

According to plaintiff, on the same day that Kelly did not respond to the voicemail messages from male tester #2 confirming their appointment, female tester #3 called Kelly to inquire about the listing for apartment number 7 at 4233 Fontainebleau Drive.[40]  Kelly allegedly answered her call and made an appointment for her to view an available apartment.[41] Two days later, female tester #3 and her female companion toured apartment number 3 with Kelly, the same unit he showed to female tester #2.[42]  Plaintiff asserts that while they were viewing the apartment, Kelly "slammed the door shut to the apartment," which made both women concerned for their safety.[43]  After Kelly provided female tester #3 with an application, she allegedly told Kelly that she planned to view other apartments.[44]

---

[37] *Id.* at 13 ¶¶ 64-68.
[38] *Id.*
[39] *Id.* ¶ 69.
[40] *Id.* ¶ 70.
[41] *Id.* ¶ 71.
[42] *Id.* at 14 ¶¶ 72-73.
[43] *Id.* ¶¶ 74-76.
[44] *Id.* ¶ 78.

According to plaintiff, shortly after female tester #3 met with Kelly, male tester #3 contacted Kelly to ask about the apartment at 4233 Fontainebleau Drive advertised as available.[45] Kelly allegedly told the male tester that the unit had already been rented and ended the call.[46] Kelly allegedly did not tell male tester #3 about any other available units in the same building, as he had for female testers #2 and #3.[47] Three days after this phone call with male tester #3, Kelly allegedly contacted female tester #2 and told her that apartment number 3 at 4233 Fontainebleau Drive was still available.[48] On that same day, a new female tester allegedly contacted Kelly and left him a voicemail asking about available rentals at 4233 Fontainebleau Drive.[49] Several days later, Kelly called the tester back, and left her a voicemail stating he was returning her call regarding a unit at 4233 Fontainebleau Drive.[50]

### 4. Test 4

On October 3, 2017, female tester #4 allegedly left Kelly a voicemail message inquiring about an advertised unit at 7927 Birch Street in New

---

[45]  *Id.* at 14-15 ¶ 79.
[46]  *Id.* at 15 ¶ 80.
[47]  *Id.*
[48]  *Id.* ¶ 81.
[49]  *Id.* ¶ 82.
[50]  *Id.* ¶ 83.

Orleans.[51]  Plaintiff asserts that Kelly returned her message the following morning, and that they eventually arranged for the female tester to view the apartment on October 6, at noon.[52]  On October 5, male tester #4 allegedly contacted Kelly to inquire about the same advertised unit.[53]  Kelly allegedly answered the phone call, and made an appointment for the male tester to view the unit on October 6 at 2 p.m., two hours after female tester #4's appointment.[54]  According to plaintiff, Kelly instructed the male tester to call him on the morning of their appointment to confirm it.[55]

Plaintiff asserts that during female tester #4's tour of the unit, Kelly told her she was "an all grown up woman" and that she was too "pristine and together" to live at that property.[56]  When the female tester inquired about the application process, Kelly allegedly told her that she need only fill out a rental application, and that he would forgo the usual credit check because she was a "grown woman" who "looked like she was valedictorian at her college."[57]

---

[51]    *Id.* ¶ 84.
[52]    *Id.* at 15-16 ¶¶ 85-86.
[53]    *Id.* at 16 ¶ 87.
[54]    *Id.*
[55]    *Id.*
[56]    *Id.* ¶ 89.
[57]    *Id.* ¶ 91.

On that same morning, male tester #4 allegedly followed Kelly's instructions and contacted him to confirm their appointment.[58] According to plaintiff, the male tester was unable to reach Kelly until late in the afternoon, at which point Kelly told him that he could not show the tester the unit that day as they had planned.[59] Kelly allegedly agreed to show the unit to the male tester three days from the date of their originally scheduled appointment.[60] Plaintiff asserts that on the day of their rescheduled appointment, Kelly allegedly left a key for male tester #4 in the mailbox at the unit, and instructed him to view the apartment on his own.[61] Plaintiff asserts that male tester #4 later called Kelly to inquire about the application process.[62] Kelly allegedly told him that they could meet in two days to discuss the process, and that the male tester should bring his driver's license, proof of employment, current lease, and a deposit check for $950.[63] Plaintiff alleges that Kelly never followed up with male tester #4 after this call.[64]

---

[58]    *Id.* at 16-17 ¶ 93.
[59]    *Id.* at 17 ¶¶ 94-97.
[60]    *Id.* ¶ 98.
[61]    *Id.* ¶ 99.
[62]    *Id.* ¶ 100.
[63]    *Id.* at 17-18 ¶¶ 101-02.
[64]    *Id.* at 18 ¶ 103.

## C.    Plaintiff's Complaint and Subsequent Developments

On August 28, 2018, plaintiff filed this complaint in federal court against (1) Kelly; (2) 4233 Fontainebleau Dr NOLA LLC;[65] (3) 7927 ½ Birch St NOLA LLC;[66] and (4) Investment Properties of J&L, LLC,[67] alleging violations of the Fair Housing Act (FHA) and the Louisiana Equal Housing Opportunity Act.[68]  Plaintiff alleges that defendants (1) refused to rent and made housing unavailable to a person on the basis of sex, (2) discriminated against a person in the terms, conditions, and privileges of renting housing on the basis of sex, and (3) made statements indicating rental preferences, limitations, and discrimination based upon sex.[69]  Plaintiff seeks a declaratory judgment that defendants have violated federal and state law, and an injunction enjoining defendants from discriminating against any

---

[65]    4233 Fontainebleau Dr NOLA LLC is allegedly the manager of the property comprising the rental units at 4233 Fontainebleau Drive.  *Id.* at 5 ¶ 15.

[66]    7927 ½ Birch St NOLA LLC is allegedly the manager of the property comprising the rental units at 7927 Birch Street.  *Id.* ¶ 16.

[67]    Investment Properties of J&L, LLC is allegedly the primary officer and manager of both 4233 Fontainebleau Dr NOLA LLC and 7927 ½ Birch St NOLA LLC.  *Id.* at 6 ¶¶ 21-22.

[68]    *See id* at 1, 19-21.

[69]    *Id.* at 19-21.

person on the basis of sex.[70]   Plaintiff also seeks compensatory damages, punitive damages, and costs and attorney's fees.[71]

On September 27, 2018, defendants moved to dismiss the complaint.[72] Defendants argue that plaintiff does not have standing to brings its claims, and that plaintiff fails to state a claim upon which relief can be granted.[73]  In the alternative, defendants move to strike certain sections of the complaint.[74]

On December 19, 2018, plaintiff filed a supplemental complaint.[75]  The supplemental complaint repeats all of the allegations in the initial complaint, and includes additional allegations containing statements Kelly allegedly made to a newspaper reporter in August 2018—after plaintiff filed its first complaint but before defendants filed their motion to dismiss.[76]  Plaintiff asserts that Kelly stated, in reference to a property he owns at 2324 Calhoun Street in New Orleans, that he "like[s] to keep it with just girls at that building."[77]  Defendants filed a renewed motion to dismiss or strike on January 2, 2019, asserting that Kelly's alleged statements in the

---

[70]    *Id.* at 22-23.
[71]    *Id.* at 23.
[72]    R. Doc. 9.
[73]    R. Doc. 9-1.
[74]    *Id.*
[75]    R. Doc. 24.
[76]    *Id.*
[77]    *Id.* at 18-19 ¶ 109; R. Doc. 24-1 at 3.

supplemental complaint do not support an inference that defendants have violated federal or state law.[78]

## II.  LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject matter jurisdiction. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)). "Courts may dismiss for lack of subject matter jurisdiction on any one of three bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). Furthermore, plaintiff bears the burden of demonstrating that subject matter jurisdiction exists. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

---

[78]    R. Doc. 25; R. Doc. 25-1.

## B. Federal Rule of Civil Procedure 12(b)(6)

To survive a Rule 12(b)(6) motion, a party must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the party pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the nonmoving party.  *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

A legally sufficient complaint must establish more than a "sheer possibility" that the party's claim is true.  *Iqbal*, 556 U.S. at 678.  It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action.  *Id.* In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal relevant evidence of each element of the party's claim.  *Lormand*, 565 F.3d at 257.  The claim must be dismissed if there are insufficient factual allegations to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, or if it is

apparent from the face of the complaint that there is an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007).

## III. DISCUSSION

### A. Motion to Dismiss

#### 1. Standing

In any suit in federal court, the issue of standing presents a "threshold jurisdictional question." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). The requirement that a party have standing to sue flows from Article III of the Constitution, which limits the scope of the federal judicial power to the adjudication of "cases" or "controversies." U.S. Const. art. III, § 2. Standing consists of three elements: (1) the plaintiff must have suffered an "injury-in-fact," which is an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent"; (2) the injury must be "fairly traceable" to the challenged conduct of the defendant; and (3) it must be likely that plaintiff's injury will be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). As the party invoking federal jurisdiction, plaintiff has the burden of establishing these elements. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). At the

pleading stage, a plaintiff can satisfy this burden by "alleg[ing] facts demonstrating each element" of standing. *Id.* (internal quotation omitted).

An organization, such as the plaintiff in this case, "can establish standing in its own name if it meets the same standing test that applies to individuals." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). Defendants contend that plaintiff has not sufficiently alleged that it has suffered an injury-in-fact and therefore does not have Article III standing to bring its claims.[79] Nonprofit organizations can suffer an Article III injury when a defendant's actions frustrate their missions and force them to "divert significant resources to counteract the defendant's conduct." *N.A.A.C.P. v. City of Kyle, Texas*, 626 F.3d 233, 238 (5th Cir. 2010) (citing *Havens Realty Corp.*, 455 U.S. at 379); *OCA-Greater Houston*, 867 F.3d at 612. For instance, the Fifth Circuit has held that an organization devoted to promoting civic participation among Chinese and Asian Pacific Americans suffered an Article III injury when it diverted its resources to educate the community about how to avoid the alleged discriminatory effects of a Texas voting law. *OCA-Greater Houston*, 867 F.3d at 612.

---

[79] R. Doc. 9-1 at 2-5.

Here, plaintiff alleges that it has been injured because defendants have frustrated its mission of combating housing discrimination in the New Orleans community.[80]  Specifically, plaintiff alleges it has expended resources, including "staff time and organizational funds," to "engage in education and outreach activities to counteract the effects" of defendants' alleged discrimination.[81]  These activities allegedly include creating and circulating brochures and advertisements addressing sex discrimination and sexual harassment in housing, as well as making presentations on these topics to student groups.[82]  Plaintiff asserts that as a result of these expenditures, it has been forced to divert resources away from other planned projects and activities, including (1) other investigative initiatives; (2) recruitment of financial sponsors for its annual fair housing summit; and (3) development and publication of new fair housing educational materials.[83] This diversion of resources has allegedly caused plaintiff to suffer decreased funding and a delay in providing its usual educational services to the community.[84]

---

[80]    R. Doc. 1 at 18 ¶ 104.
[81]    *Id.* ¶ 105.
[82]    *Id.*
[83]    *Id.* at 19 ¶ 106.
[84]    *Id.*

These factual allegations are sufficient to plead an Article III injury, because plaintiff alleges that it has diverted its resources toward education and outreach activities to address the impact of defendants' alleged discriminatory practices. *See id.* at 610-12; *Havens Realty Corp.*, 455 U.S. at 379 (plaintiff sufficiently pleaded Article III injury by alleging it "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices"). Importantly, plaintiff specifically alleges that it undertook these activities to counteract the effects of defendants' alleged discrimination, and not to prepare for this litigation.[85] *See OCA-Greater Houston*, 867 F.3d at 611 ("It is fundamental that no plaintiff may claim as injury the expense of preparing for litigation, for then the injury-in-fact requirement would pose no barrier."). Plaintiff has also identified with sufficient particularity other projects it has had to put on hold or curtail in order to address the impact of defendants' alleged actions—*i.e.*, preparing for its annual fair housing summit and publishing new educational materials.[86] *Cf. City of Kyle*, 626 F.3d at 238 (ruling that plaintiff lacked standing in part because at trial it failed to specify what other specific projects it had to put on hold to respond to defendant's alleged

---

[85]     *Id.* at 18 ¶ 105.
[86]     *Id.* at 19 ¶ 106.

discriminatory ordinance).  Finally, it is immaterial that this alleged injury may have amounted to only a minimal expenditure of plaintiff's resources, because an Article III injury "need not measure more than an identifiable trifle."  *OCA-Greater Houston*, 867 F.3d at 612 (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999)).[87]

Defendants rely on *Louisiana Acorn Fair Housing v. LeBlanc*, 211 F.3d 298 (5th Cir. 2000), to argue that plaintiff does not have standing.  But that decision is inapposite because it involved a different procedural posture. There, the Fifth Circuit vacated a jury's compensatory damages award after determining that the plaintiff had failed to prove it had Article III standing at trial.  *LeBlanc*, 211 F.3d at 304-06.  In doing so, the Fifth Circuit applied the same standing principles that the Court applies today, recognizing that

---

[87]    Plaintiff also alleges that it has been injured because of its expenditures on "witness interviews and testing" to "identify defendants' unlawful discrimination."  *Id.* at 18 ¶ 105.  These expenses qualify as an Article III injury to the extent they were undertaken solely to identify or confirm defendants' alleged discriminatory practices, and not to prepare for litigation.  *See Havens Realty Corp.*, 455 U.S. at 379; *OCA-Greater Houston*, 867 F.3d at 611; *City of Kyle*, 626 F.3d at 238 (plaintiff's expenditure of $15,000 for a study on the impact of defendant's allegedly discriminatory ordinance, which plaintiff then relied upon at trial to prove the ordinance's disparate impact, was not an Article III injury); *Fowler*, 178 F.3d at 358 (compilation of statistical evidence regarding the impact of an allegedly discriminatory voter registration law, when put together "in connection" with the lawsuit, was not an Article III injury).  As already addressed, plaintiff has sufficiently pleaded a constitutional injury even without this allegation.

"an organization could have standing if it had proven a drain on its resources resulting from counteracting the effects of the defendant's actions." *Id.* at 305. But the Fifth Circuit found that the plaintiff failed to prove at trial that counteracting the defendant's alleged actions had caused it to drain its resources; instead, the plaintiff's executive director's testimony regarding its injury-in-fact was "conjectural, hypothetical, and speculative." *Id.* at 305-06. Because the case here is merely at the pleading stage, plaintiff need not *prove* that its efforts have led to a drain on its resources. Plaintiff need only allege facts demonstrating each element of standing. *Spokeo, Inc.*, 136 S. Ct. at 1547; *Lujan*, 504 U.S. at 561 (the plaintiff must establish each element of standing "with the manner and degree of evidence required at the successive stages of the litigation"). Plaintiff has met this requirement for each element of Article III standing.[88]

---

[88] Defendants do not argue that plaintiff has failed to allege the second and third elements of Article III standing—that defendants have caused plaintiff's injuries and that a favorable decision from the Court will redress them. The Court finds that both elements have been satisfied. Plaintiff alleges that defendants' actions are the reason it has had to expend additional resources in its community, and it is self-evident that an injunction from the Court enjoining defendants from engaging in discriminatory practices would allow plaintiff to cease those expenditures.

## 2. Failure to State a Claim

Plaintiff has brought claims under three provisions of the FHA—42 U.S.C. §§ 3604(a), (b), and (c)—and under analogous provisions of the Louisiana Equal Housing Opportunity Act.[89] Defendants argue that plaintiff has failed to state a claim under either statute.[90]

### a. 42 U.S.C. § 3604(a) and La. R.S. 51:2606(A)(1)

Section 3604(a) of the FHA makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). It is well-recognized that allegations of disparate treatment of testers can be used to state a claim under the FHA. *See, e.g., Lincoln v. Case*, 340 F.3d 283, 286 & 293 (5th Cir. 2003) (telling white testers an apartment is available but black testers that it is unavailable was evidence of housing discrimination); *Alexander v. Riga*, 208 F.3d 419, 431-32 (3d Cir. 2000); *Richardson v. Howard*, 712 F.2d 319, 321-22 (7th Cir. 1983); *see also*

---

[89]     R. Doc. 1 at 19-22.

[90]     R. Doc. 9-1 at 6-10. Because the language in the relevant sections of the FHA and Louisiana Equal Housing Opportunity Act are nearly identical, the Court's analysis of plaintiff's FHA claims applies with equal force to its claims under the state statute. *See Jackson v. Scott*, No. 07-6645, 2010 WL 11538701, at *1 n.1 (E.D. La. Jan. 14, 2010).

*Grant v. Smith*, 574 F.2d 252, 254 n.3 (5th Cir. 1978) ("The use of testers has been accepted by the courts, tacitly or expressly, as an effective means of obtaining evidence of discrimination."); *Havens Realty Corp.*, 455 U.S. at 368. Plaintiff alleges that Kelly refused to negotiate with the male testers or otherwise made housing unavailable to them in violation of § 3604(a).[91] Plaintiff must allege facts showing that the testers' sex was "one significant factor" motivating Kelly's actions. *Woods-Drake v. Lundy*, 667 F.2d 1198, 1202 (5th Cir. 1982).

Plaintiff has alleged sufficient facts to state a claim under this provision. In particular, plaintiff alleges that when male tester #3 contacted Kelly about the advertised listing at 4233 Fontainebleau Drive apartment number 7, Kelly told the tester that the unit had been rented.[92] Kelly allegedly did not tell the male tester that any other units in that building were available.[93] But Kelly allegedly gave different information to the female

---

[91] R. Doc. 14 at 8.
[92] R. Doc. 1 at 15 ¶ 80.
[93] *Id.* According to plaintiff, Kelly did initially schedule an appointment to show male tester #2 a unit at 4233 Fontainebleau Drive. *Id.* at 12 ¶ 63. But when male tester #2 called Kelly to confirm the appointment, as Kelly had instructed him to do, Kelly never answered the phone or returned the tester's voicemails. *Id.* at 13 ¶¶ 64-69. Kelly's initial response to male tester #2 thus does not undermine plaintiff's allegation that Kelly made housing unavailable to the male testers while showing available units at 4233 Fontainebleau Drive to the female testers.

testers.  First, plaintiff asserts that when female testers #2 and #3 initially called Kelly, he volunteered that although apartment 7 was no longer available, he could show them apartment 3.[94]  Second, three days after Kelly indicated to male tester #3 that no units at 4233 Fontainebleau Drive were available, he allegedly contacted female tester #2 again to communicate that apartment 3 was still available.[95]  And third, a new female tester allegedly contacted Kelly after Kelly told male tester #3 that no units were available, and Kelly returned the female tester's call and asked her to call him back.[96]

More generally, plaintiff's allegations—which the Court must accept as true at this stage of the proceedings—present a pattern of treating the male and female testers differently with respect to the availability of rental units. According to plaintiff's allegations, it is evident that during the time period in which the first three tests were conducted, there was at least one available apartment to rent at 4233 Fontainebleau Drive.  Plaintiff alleges that in each of the first three tests, Kelly responded promptly to the female testers and arranged for them to view an available unit.  But for each of the three male testers, Kelly either did not return their phone calls, did not confirm their

---

[94]    *Id.* at 12 ¶¶ 61-62; 14 ¶¶ 72-73.
[95]    *Id.* at 15 ¶ 81.
[96]    *Id.* ¶¶ 82-83.

appointments, or misrepresented the availability of the units.[97]  These factual allegations are sufficient to state a violation of § 3604(a).  *See* 42 U.S.C. § 3604(a) (prohibiting a landlord from "refus[ing] to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . sex"); *Lincoln*, 340 F.3d at 286 & 293.

Defendants argue that to assume Kelly treated the male and female testers differently because of their sex is "pure speculation."[98]  While it may be speculative to assume that *one* instance of differential treatment evidences discriminatory intent, the pattern plaintiff alleges moves its allegations from speculative to plausible.  *Iqbal*, 556 U.S. at 678 (a party must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" (internal quotation omitted)).  And plaintiff's contention that Kelly had a discriminatory animus is bolstered by the numerous other allegations related to plaintiff's rental practices.[99]  For instance, a former leasing agent for Kelly's properties allegedly told plaintiff that Kelly prefers to rent to "young, skinny, white" girls.[100]  Plaintiff further alleges that after it filed its complaint, Kelly told a newspaper reporter that

---

[97]  *Id.* at 11 ¶¶ 56-57, 12-13 ¶¶ 63-69, 14-15 ¶¶ 79-80.
[98]  R. Doc. 9-1 at 7.
[99]  *See* R. Doc. 1 at 6-9.
[100]  *Id.* at 7 ¶ 27.

for one of his properties, he "likes to keep it with just girls."[101] When viewing plaintiff's allegations as a whole, it is plausible that the testers' sex was a significant factor motivating Kelly. *See Woods-Drake*, 667 F.2d at 1202 ("Plaintiff need only prove that [the protected trait] was one significant factor in defendant's dealings . . . to establish a violation of the Fair Housing Act.")

Plaintiff's factual allegations are sufficient to state a claim under § 3604(a).

### b. 42 U.S.C. § 3604(b) and La. R.S. § 51:2606(A)(2)

It is unlawful under § 3604(b) to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). A landlord can violate this provision by placing different application or closing requirements on prospective tenants because of a protected trait. *See United States v. Pelzer Realty Co., Inc.*, 484 F.2d 438, 443 (5th Cir. 1973) (defendant violated FHA by placing different requirements on waiver of closing costs for black and white buyers); *United States v. Collier*, No. 08-686, 2010 WL 3881381, at *9 (W.D. La. Sept. 28, 2010) ("Instituting different requirements for prospective purchasers because of [a protected

---

[101]     R. Doc. 24 at 18-19 ¶ 109.

trait] can be a violation of Section 3604(b)."). Several federal circuits have held that a plaintiff can also state a claim under this provision by alleging that a landlord's sexual harassment created a hostile housing environment, because such harassment is discrimination that amounts to different terms, conditions, or privileges on the use of a dwelling. *See Quigley v. Winter*, 598 F.3d 938, 946-47 (8th Cir. 2010); *DiCenso v. Cisneros*, 96 F.3d 1004, 1008-09 (7th Cir. 1996); *Honce v. Vigil*, 1 F.3d 1085, 1088-90 (10th Cir. 1993). Here, plaintiff states a violation of this provision under both theories.

Plaintiff alleges that when female tester #4 toured a unit at 7927 Birch Street, Kelly told her that she was "an all grown up woman" who was "too pristine and together" to live at that property.[102] When female tester #4 asked about the application process for renting the unit, Kelly allegedly responded that she need only fill out an application, and that he would forego a credit check because she was a "grown woman" who "looked like she was valedictorian at her college."[103] But when male tester #4 asked Kelly a similar question about a unit at the same property, Kelly allegedly responded that the tester would have to present his driver's license, proof of employment, his current lease, and a deposit check for $950.[104] Plaintiff thus

---

[102]  R. Doc. 1 at 16 ¶ 89.
[103]  *Id.* ¶ 91.
[104]  *Id.* at 17-18 ¶ 101.

asserts that Kelly placed different conditions on the application materials the female and male testers were to submit for the same rental unit, in violation of § 3604(b).  *See Pelzer Realty Co., Inc.*, 484 F.2d at 443; *Collier*, 2010 WL 3881381, at *9.

It is true, as defendants point out,[105] that when taken in isolation, Kelly's comments to female tester #4 about her appearance might be construed as partly about her financial status.  Under this interpretation, Kelly's willingness to forego the female tester's credit check, but not the male tester's, was not because of their sex, but because of his perceptions about their ability to afford the apartment.  But to find that Kelly violated § 3604(b), a jury would not have to conclude that sexual prejudice "dominated [his] mind during the negotiations."  *Pelzer Realty Co., Inc.*, 484 F.2d at 443. The applicants' sex need only be "one significant factor" Kelly considered when placing different conditions on their applications.  *Id.* (finding a violation of § 3604(b) even though the court did not "doubt that [defendant's] primary goal was to make money, not to violate the Fair Housing Act").  And when analyzing defendants' motion to dismiss, the Court must draw all reasonable inferences in favor of plaintiff, the nonmoving party.  *See Lormand*, 565 F.3d at 232.

---

[105]     *See* R. Doc. 20 at 2.

When applying these standards, the allegation that Kelly told female tester #4 that he would forego her credit check because she was a "grown woman" is enough to state a plausible claim for relief under § 3604(b). First, this alleged statement specifically isolates female tester #4's sex as a factor in Kelly's decision. *Cf. Hood v. Pope*, 627 F. App'x 295, 299 (5th Cir. 2015) (dismissing allegation when plaintiffs "alleged nothing that isolate[d] race as a factor in [defendant's] motivations"). Second, plaintiff has presented a number of factual allegations that the sex of Kelly's prospective and current tenants significantly impacted his interactions with them. Viewing this alleged statement in that context, and drawing all reasonable inferences in plaintiff's favor, it is plausible that the two testers' sex was "one significant factor" motivating Kelly's actions.

Next, as mentioned above, several circuits have held that a landlord's sexual harassment of a tenant can constitute discrimination that is actionable under § 3604(b). *See Quigley*, 598 F.3d at 946-47; *DiCenso*, 96 F.3d at 1008-09; *Honce*, 1 F.3d at 1088-90. These decisions are based upon the well-established principle—applied most often in the context of Title VII employment discrimination cases—that "harassment based on sex is a form of discrimination." *Honce*, 1 F.3d at 1089; *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) ("[W]hen a supervisor sexually harasses a

subordinate because of the subordinate's sex, that supervisor 'discriminates' on the basis of sex.").  These circuits' interpretation of the FHA is consistent with regulations promulgated by the Department of Housing and Urban Development.  *See* 24 C.F.R. § 100.65(b)(7) (Section 3604(b) prohibits "[s]ubjecting a person to harassment because of . . . sex . . . that has the effect of imposing different terms, conditions, or privileges relating to the sale or rental of a dwelling or denying or limiting services or facilities in connection with the sale or rental of a dwelling").

The Fifth Circuit has not ruled whether a discrimination claim under the FHA, like claims under Title VII, can be premised on sexual harassment allegations.[106]  But in light of these out-of-circuit precedents, and the Supreme Court's recognition that sexual harassment can constitute discrimination in the Title VII context, the Court finds that plaintiff can state a claim under § 3604(b) with allegations of sexual harassment.

Courts apply the Title VII sexual harassment standards for these claims under the FHA.  *See Honce*, 1 F.3d at 1089.  Under Title VII, there are two distinct categories of sexual harassment: "quid pro quo" and hostile

---

[106]    Other district courts in Louisiana and Texas have followed these out-of-circuit precedents and ruled that it can.  *See, e.g.*, *Doe v. Duckworth*, No. 11-2963, 2013 U.S. Dist. LEXIS 113287, at *5-6 (E.D. La. Aug. 12, 2013); *Baker v. Waterford Square Homeowners Ass'n*, No. 00-354, 2002 WL 1461735, at *3 (N.D. Tex. July 2, 2002).

environment harassment. *Id.* Plaintiff argues that its allegations that Kelly sexually harassed one of his tenants, "B.C.," are sufficient to state a claim that Kelly created a hostile housing environment.[107] This type of claim is "actionable when the offensive behavior interferes with [a tenant's] use and enjoyment of the premises." *Id.* at 1090. "The harassment must be sufficiently severe or pervasive to alter the conditions of the housing arrangement." *Id.* (internal quotation omitted). This finding "can be determined only by looking at all the circumstances, [including] the frequency of the discriminatory conduct; its severity; and whether it is physically threatening or humiliating[] or a mere offensive utterance." *DiCenso*, 96 F.3d at 1008. Allegations of "isolated or trivial" harassment are not sufficient to state a claim. *Honce*, 1 F.3d at 1089. Finally, "[e]vidence of harassment of other female tenants is relevant" to another tenant's allegations. *Id.*

Kelly's alleged harassment of B.C. was sufficiently severe and pervasive to alter the conditions of her housing arrangement. Plaintiff alleges that (1) Kelly grabbed B.C.'s buttocks without her consent when they met for her to sign her lease;[108] (2) Kelly told B.C. during this meeting that he returned her

---

[107]     R. Doc. 14 at 13-17.
[108]     R. Doc. 1 at 8 ¶ 38.

call about the apartment only because she sounded attractive over the phone, and that he would not have rented to her if he had known she had a husband;[109] and (3) Kelly "peered into [B.C.'s] apartment windows when she was home and repeatedly entered her apartment without warning and without her consent," including once while she was in the shower.[110]

These allegations are similar to the ones in *Quigley*, where the Eighth Circuit upheld a jury verdict finding that the defendant created a hostile housing environment. There, the plaintiff testified that her landlord

> subjected her to unwanted touching on two occasions, made sexually suggestive comments, rubbed his genitals in front of her, placed several middle of the night phone calls to her home, made repeated unannounced visits, and, on one occasion, while [the landlord] lay on [the plaintiff's] couch, had to be told to leave her home at least three times before he complied.

*Quigley*, 598 F.3d at 947. The court concluded that the landlord's behavior amounted to discrimination because it "interfered with [the plaintiff's] use and enjoyment of her home." *Id.* Here, plaintiff similarly alleges that Kelly touched B.C. inappropriately, made sexually suggestive comments, and *repeatedly* entered her home without her consent, including once when B.C. was in the shower. These allegations are not mere "isolated" instances of harassment. *Cf. DiCenso*, 96 F.3d at 1008-09 (one discrete instance of

---

109    *Id.* at 9 ¶¶ 39-40.
110    *Id.* ¶ 41.

harassment not sufficient to create a hostile housing environment); *Honce*, 1 F.3d at 1090 (allegations that landlord asked the plaintiff to "accompany him socially on three occasions" did not create a hostile housing environment).

Finally, the allegations with respect to B.C. should be viewed in the context of plaintiff's other allegations that Kelly's behavior was so egregious that he caused multiple female tenants to break their leases and vacate their apartments.[111] *See Honce*, 1 F.3d at 1089 ("Evidence of harassment of other female tenants is relevant to plaintiff's claim."). Specifically, Kelly's former leasing agent allegedly told plaintiff that Kelly harassed several of his female tenants by making sexual propositions, entering their apartments without consent, requesting dates, and making multiple late-night phone calls.[112] "A.B.," one of Kelly's former tenants, also allegedly told plaintiff that Kelly repeatedly let himself into her apartment without her consent, asked her for dates, and told her he would reduce her rent if she set him up with one of her friends.[113] Kelly's actions allegedly caused A.B. to break her lease and move

---

[111]   *Id.* at 7 ¶ 30, 8 ¶ 37.
[112]   *Id.* ¶ 29.
[113]   *Id.* at 8 ¶¶ 35-36.

out of her apartment.[114]  Viewing all of these allegations together, plaintiff states a claim that Kelly created a hostile housing environment for B.C.

<em>c.      42 U.S.C. § 3604(c) and La. R.S. § 51:2606(A)(3)</em>

Section 3604(c) makes it illegal to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c).  The prohibitions in this section "apply to all written *or oral* notices or statements by a person engaged in the sale or rental of a dwelling."  24 C.F.R. § 100.75(b) (emphasis added); *see Collier*, 2010 WL 3881381, at *10 (oral statement to real estate agent indicating preference for renting to whites constituted violation of § 3604(c)).  Plaintiff has stated a claim under this provision.

Plaintiff must establish three elements to state a violation of § 3604(c): that (1) Kelly made a statement; (2) the statement was made "with respect to the sale or rental of a dwelling;" and (3) the statement indicated a preference based on protected class membership.  *White v. U.S. Dep't of Hous. & Urban Dev.*, 475 F.3d 898, 904-05 (7th Cir. 2007) (citing 42 U.S.C. § 3604(c));

---

[114]     *Id.* ¶ 37.

*Hunter v. Williamson*, No. 07-7970, 2008 WL 2599110, at *3 (E.D. La. June 25, 2008).  Whether a statement indicates a preference for renting to one sex over another is an "objective standard" that does not take into account the subjective intent of the speaker.  *White*, 475 F.3d at 905-06; *La. Acorn Fair Hous., Inc. v. Canal Street Dev. Corp.*, No. 96-3684, 1997 WL 598470, at *2 (E.D. La. Sept. 23, 1997) (noting that a plaintiff need "not establish discriminatory intent to prove a violation" of the provision (citing *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991))).  Courts instead ask whether the oral statement in question would suggest to an "ordinary listener" that one sex is "preferred or disfavored."  *White*, 475 F.3d at 905-06.

Plaintiff's complaint contains two statements attributed to Kelly that can support a § 3604(c) claim.  First, plaintiff alleges that when Kelly met with B.C. to review and sign a lease, Kelly told her that he returned her initial call inquiring about the apartment only because he "believed she was attractive based on the sound of her voice."[115]  This alleged statement was "with respect to the sale or rental of a dwelling" because Kelly made it during a meeting to sign a rental lease.  42 U.S.C. § 3604(c); *see Stewart v. Furton*, 774 F.2d 706, 707-08 & 710 (6th Cir. 1985) (defendant's statement to

---

[115]    *Id.* at 8-9 ¶¶ 38-39.

prospective renter during inspection of rental unit that he "did not allow black tenants" violated § 3604(c)). And an "ordinary listener" could construe Kelly's alleged statement as an indication that he preferred to rent to women because he explicitly stated that his sense of B.C.'s attractiveness was the only reason he returned her call. Courts have found that statements that are far less explicit about the speaker's preference can violate § 3604(c). *See, e.g.*, *Ragin*, 923 F.2d at 1000-02 (denying motion to dismiss because a trier of fact could conclude that housing advertisement using only white models may be read by an ordinary reader as indicating preference for white renters).

Second, Kelly's alleged statements to female tester #4 during her tour of an apartment at 7927 Birch Street can also support a claim under § 3604(c). Kelly allegedly told the tester that she was "an all grown up woman" who was "too pristine and together" to live at the apartment.[116] He also allegedly stated that he would forego her credit check because she appeared to be a "grown woman."[117] These statements were with respect to the rental of a dwelling because Kelly made them while showing an available unit to a prospective tenant. *See Stewart*, 774 F.2d at 707-08; *Jancik v. Dep't of Hous. & Urban Dev.*, 44 F.3d 553, 557 (7th Cir. 1995). And as already

---

[116]    *Id.* at 16 ¶ 89.
[117]    *Id.* ¶ 91.

35

discussed, it is plausible on its face that female tester #4's sex was one significant factor for why Kelly loosened her application requirements. Likewise, an "ordinary listener" could plausibly infer that by isolating her sex as a reason for placing different terms and conditions on her application, Kelly was indicating a preference for renting to women. *See Ragin*, 923 F.2d at 1000-02; *see also Iniestra v. Cliff Warren Investments, Inc.*, 886 F. Supp. 2d 1161, 1169 (C.D. Cal. 2012) (apartment complex rules found facially discriminatory on the basis of familial status in violation of § 3604(b) also constituted statements in violation of § 3604(c)).

Plaintiff argues that two other statements attributed to Kelly can constitute violations of this provision: (1) his alleged statement to A.B. that he "only rents to women;" and (2) his statement to a newspaper reporter that he "likes to keep it with just girls" at one of his apartment buildings.[118] But unlike the statements the Court finds actionable, plaintiff does not allege that either of these statements were made "with respect to the sale or rental of a dwelling." 42 U.S.C. § 3604(c). They are instead statements about his general renting practices, disconnected from a specific sale or rental. Plaintiff does not cite a case holding that such statements can constitute a violation of § 3604(c). Many federal district courts have in fact interpreted

---

[118] R. Doc. 14 at 19; R. Doc. 27 at 1-2.

this provision as creating liability only when a defendant makes statements in connection with the prospective sale or rental of an available dwelling. *See, e.g.*, *Gourlay v. Forest Lake Estates Civic Ass'n of Port Richey, Inc.*, 276 F. Supp. 2d 1222, 1234 (M.D. Fla. 2003) (collecting cases) (vacated on separate grounds). The Court adopts this interpretation because it comports with the statute's plain language and purpose. *See* 42 U.S.C. § 3604(c) (prohibiting discriminatory statements "with respect to the sale or rental of a dwelling"); *United States v. Space Hunters, Inc.*, No. 00-1781, 2001 WL 968993, at *5 (S.D.N.Y. Aug. 24, 2001) ("The purpose of Section 3604(c) is to prevent expressions that result in the denial of housing, not to prevent all discriminatory expression."). Kelly's statements to A.B. and the newspaper reporter may be relevant to plaintiff's allegations that the testers' sex was one significant factor motivating Kelly's actions, but the statements are not alone violations of the FHA.

Finally, defendants argue that plaintiff is not entitled to relief under § 3604(c) because it does not allege that Kelly made any statement to a tester that could constitute a violation of the provision.[119] First, Kelly's alleged statements to female tester #4 can in fact constitute a violation of § 3604(c). But even if they couldn't, and plaintiff's claim relied entirely on Kelly's

---

[119]     R. Doc. 9-1 at 10.

alleged statements to B.C., defendants' argument would still be meritless. As already addressed, plaintiff has standing to bring these claims not because its testers suffered injuries, but because plaintiff itself has suffered injuries as a result of defendants' alleged discriminatory practices. An organization like plaintiff is permitted to bring a suit alleging that a defendant's actions toward third parties violated the FHA, so long as the plaintiff meets the standing requirements. *See, e.g.*, *OCA-Greater Hous.*, 867 F.3d 604; *Banks v. Hous. Auth. of City of Bossier City, La.*, No. 11-551, 2011 WL 4591899, at *3-4 (W.D. La. Sept. 30, 2011). It is therefore irrelevant that some of Kelly's alleged statements were made to third parties.

Because all three elements of plaintiff's § 3604(c) claim are met, defendants' motion to dismiss the claim is denied.

### B. Alternative Motion to Strike

Defendants also move to strike eight paragraphs from plaintiff's complaint.[120]

---

[120]    *See id.* at 10-13; R. Doc. 1 at 1 ¶ 1 (alleging that former tenants reported a hostile environment so severe that they broke their leases, including allegations that Kelly demanded dates, offered to exchange rent for sexual favors, and entered apartments without the tenants' consent); *id.* at 2 ¶ 2 (alleging that Kelly grabbed the buttocks of a woman during a meeting to review and sign a lease); *id.* at 7 ¶ 27 (alleging that Kelly's former leasing agent told plaintiff that Kelly likes to rent to "young, skinny, white" girls); *id.* at 8 ¶ 36 (alleging that Kelly asked a tenant for a date and told her he would reduce her rent if she "set him up on a date" with a female friend); *id.* ¶ 38

Federal Rule of Civil Procedure 12(f) allows the court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A motion to strike under Rule 12(f) "is a drastic remedy to be resorted to only when required for the purposes of justice." *Augustus v. Bd. of Pub. Instruction of Escambia Cty., Fla.*, 306 F.2d 862, 868 (5th Cir. 1962); *see also Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982) ("[M]otions to strike a defense are generally disfavored, . . ."); *Synergy Mgmt., LLC v. Lego Juris A/S*, No. 07-5892, 2008 WL 4758634, at *1 (E.D. La. Oct. 24, 2008) ("Motions to strike made under Rule 12(f) are viewed with disfavor by the federal courts, and are infrequently granted."). A motion to strike should be granted only when "the allegations are prejudicial to the defendant or immaterial to the lawsuit." *Johnson v. Harvey*, No. 96-3438, 1998 WL 596745, at *7 (E.D. La. Sept. 8, 1998) (internal quotation omitted). Immateriality is established by showing that the challenged allegations "can

_____

(alleging that Kelly grabbed a prospective tenant's buttocks during a meeting for the tenant to review and sign a lease); *id.* at 9 ¶ 41 (alleging that Kelly entered a female tenant's apartment without her consent while she was in the shower); *id.* at 11 ¶ 53 (alleging that during a meeting with two of the female testers, Kelly "openly star[ed]" at the testers' bodies and "nibbl[ed] his lip" as he looked at their legs); *id.* at 14 ¶ 74 (alleging that while two of the female testers viewed an apartment, Kelly forcefully slammed the door shut to the apartment).

have no possible bearing upon the subject matter of the litigation." *Bayou Fleet P'ship v. St. Charles Parish*, No. 10-1557, 2011 WL 2680686, at *5 (E.D. La. July 8, 2011) (internal quotation omitted).

None of the allegations to which defendants object is immaterial to plaintiff's complaint, and therefore the Court will not strike them. First, many of these allegations are critical to plaintiff's claim that Kelly violated § 3604(b) of the FHA by creating a hostile housing environment for one tenant. Second, each of these paragraphs is relevant to plaintiff's discrimination allegations generally, because each speaks to Kelly's motive in allegedly making his rental units unavailable to men. They do so by implying that Kelly preferred to rent to women because he is sexually attracted to them. The Court will thus not strike these allegations because they are relevant to plaintiff's claims. *See* Wright & Miller, 5C *Federal Practice and Procedure* § 1382 (3d ed. 2018) ("It is not enough that the matter offends the sensibilities of the objecting party if the challenged allegations describe acts or events that are relevant to the action.").[121]

---

[121] Defendants also argue that several of these statements should be struck because they were not made by a party to this lawsuit and are therefore immaterial. R. Doc. 9-1 at 12. The statements in question are by Kelly's former tenants and former leasing agent, and recount Kelly's behavior or comments to them. *See, e.g.*, R. Doc. 1 at 7 ¶ 27 (alleging that Kelly's former leasing agent told plaintiff that Kelly likes to rent to "young, skinny, white" girls). Defendants do not cite any decision in which otherwise relevant

## IV. CONCLUSION

For the reasons stated above, defendants' motion to dismiss and alternative motion to strike is DENIED.

New Orleans, Louisiana, this __31st__ day of January, 2019.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

statements in a complaint were deemed immaterial solely because they were attributed to third parties.